HAVENS vs. THOMPSON and ALLEN.

1. A receipt, in writing, given by a son to his father, as follows: "Received, of Daniel Havens, the sum of six hundred dollars in full in lieu of dowry. (Signed) Benj. S. Havens;" *held*, under the evidence in the cause, to be an agreement by which the son, in consideration of the money so paid to him by his father, agreed with the latter that he would make no claim to a share of his father's estate, should the latter die intestate, but would be debarred therefrom by that instrument, made upon what was a satisfactory compensating consideration.

3. An agreement may be made between a father and his child, by which, in consideration of moneys advanced by the father to the child, the latter

may agree to make no claim to a share of his father's estate, should the latter die intestate, and thereby debar himself from such claim; and effect will be given to it in equity, according to the intention of the parties.

3. Where the parties to an instrument have used language which to them in their situation was sufficient to express their meaning, but which standing alone is unintelligible, but read in the light of circumstances surrounding the transaction from which it originated the meaning is clear, recourse will be had to the surrounding circumstances.

On final hearing, on pleadings and proofs.

*Mr. W. H. Vredenburgh,* for complainants.

*Mr. A. C. McLean,* for defendants.

THE CHANCELLOR.

This suit is brought under the act of 1870, to compel the determination of claims to real estate, and to quiet title. The complainants are sons of Daniel Havens, deceased, late of the county of Monmouth, who died on the 3d of April, 1871, intestate, seized of a farm in that county, and possessed in his own right of certain personal estate. He left ten children. At the time of his death the complainants were in possession of the farm, under a lease from their father to them, dated March 2d, 1871, for two years, at an annual rent of $1000. After his death the other children, except Benjamin S. Havens, who then resided in Nebraska, conveyed their respective interests in the farm to the complainants. Benjamin, in 1859, left this state and went to reside in the west, where he has continued to live ever since. In the winter of 1867 he returned to his father's house on a short visit, his object being to obtain from his father an advance of $600, to enable him to pay for a farm in the west, which he had contracted to purchase, and which he could not buy without the advance for which he then applied. His father agreed to make the advance to him on condition that it should be accepted as a complete satisfaction of Benjamin's interest in his estate, and Benjamin accepted it accordingly. After the death of Daniel

Havens, and on the 8th of May, 1871, the defendant, Thompson, sued out of the Court of Common Pleas of Monmouth county, a writ of foreign attachment against the estate of Benjamin, and under it, on the 25th of the same month, the sheriff attached Benjamin's interest in the farm. Judgment was entered in the suit, and the auditor, the defendant Allen, was proceeding to sell the interest attached, when he was stopped by an injunction issued in this cause. On the coming in of the answer of the defendants, a motion was made to dissolve the injunction. The motion was denied. *Havens* v. *Thompson*, 8 *C. E. Green* 321.

The decision of this cause must depend on the effect to be given to an instrument of writing, in form a receipt, executed and delivered by Benjamin to his father, at the time when the advance of $600 was made. It is as follows:

"$600.  JANUARY 7, 1867.

"Received of Daniel Havens, the sum of six hundred dollars in full, in lieu of dowry.  BENJ. S. HAVENS.

"Witness—P. K. FORSYTH."

It appears that, at the time when Benjamin applied to his father for the advance, the latter had paid for him, and on his account, various sums of money, amounting to a considerable sum in the aggregate. When Daniel Havens concluded to advance the money, he sent for his son-in-law, Pearson K. Forsyth, who lived near him, to come to his house. On his arrival, Daniel Havens took him into a back room which he was in the habit of using, and which he called his own. Benjamin was already there. The old man went to his desk, and took out his account book, and requested Forsyth "to do a little piece of writing for him." He then took the book and opened it, and told Forsyth to write according to his dictation, and he then dictated to Forsyth the above receipt, which Benjamin signed. Forsyth signed it also, as a witness to the transaction. The old man took $600 out of the desk, and gave it to Forsyth, and told him to count it. Forsyth did as requested, and told the old man that there were $600,

and handed the money back to him, and he handed it to Benjamin, saying : "Here is six hundred dollars. I want you to take it and make good use of it, for this is all you need ever expect from me, for I consider this, with the other money that I have paid for you, is more than I shall be able to leave to each one of my other children." To this Benjamin replied : "All right. I am much obliged to you ; I am satisfied." There is other evidence in the cause as to the understanding between Benjamin and his father, which resulted in and is evidenced by the paper under consideration. So much of it as consists of a voluntary explanatory statement in writing, made by Benjamin since his father's death, in which he declares that the object of the instrument was to fully and clearly acquit, release, and give up, in consideration of the $600 therein mentioned, all the right, title, interest and claim in the estate of his father, which would be his in any way, upon his father's death, is, for obvious reasons, not competent.

It is objected, on behalf of the attaching creditors, that no effect can be given to the receipt, because it is unintelligible; and it is also insisted, that if it be held to be a release of Benjamin's interest in his father's estate, it cannot be effectual, for the reason that there was, when it was given, no interest upon which it could operate. I regard this instrument as an agreement, by which Benjamin, in consideration of the money paid to him by his father, agreed, with the latter, that he would make no claim to a share of his father's estate, should the latter die intestate, but therefrom would be debarred by that instrument, made upon what was a satisfactory compensating consideration. Such an agreement may be made between a father and his child, in regard to the interest of the latter in the estate of the former, and effect will be given to it in equity, according to the intention of the parties. A child of a freeman of London, when of age, might, for a present fair consideration, bar himself or herself of his or her customary part. *Hancock* v. *Hancock*, 2 *Vern.* 665; *Lockyer* v. *Savage*, 2 *Strange* 947 ; *Medcalfe* v. *Ives*, 1 *Atk.* 63 ; *Heron* v. *Heron*, 2 *Atk.* 160. In this country, agreements

between father and child, by which, for a present fair consideration, the child has debarred himself from claiming any share of his father's estate, have been supported. *Quarles* v. *Quarles*, 4 *Mass.* 680 ; *Kenney* v. *Tucker*, 8 *Mass.* 143. See also, *Havens* v. *Thompson, ubi supra.* Nor does there appear to be any good reason why they should not be sustained. On the other hand, every consideration of justice demands that it should be supported.

But it is urged that the language of the instrument in question in this cause being unintelligible, recourse cannot lawfully be had to extrinsic evidence in exposition of its meaning. The parties have used language which they supposed accurately expressed their meaning. They evidently supposed that the words " in full, in lieu of dowry," would be understood to signify satisfaction of Benjamin's interest in his father's estate. A writing may be read by the light of surrounding circumstances, in order more perfectly to understand the intent and meaning of the parties. The duty of the court in such cases is to ascertain, not what the parties may have secretly intended, but what is the meaning of the words they have used. It is merely a duty of interpretation—that is, to find out the true sense of the written words as the parties used them ; and of construction—that is, when the true sense is ascertained, to subject the instrument, in its operation, to the established rules of law. 1 *Greenl. on Ev.*, § 277.

The principle of admission of parol testimony in exposition of that which is written, is that the court may be placed in regard to the surrounding circumstances, as nearly as possible, in the situation of the party whose written language is to be interpreted ; the question being, what did the person thus circumstanced mean by the language he has employed ? 1 *Greenl. on Ev.*, § 295 *a.* If the court, placing itself in the situation in which the contracting party stood at the time of executing the instrument, and with full understanding of the force and import of the words, cannot ascertain his meaning and intention from the language of the instrument thus

illustrated, it is a case of incurable and hopeless uncertainty, and the instrument, therefore, is so far inoperative and void. 1 *Greenl. on Ev.*, § 300. In the light of the circumstances of this case, there cannot be any doubt as to what the parties to the instrument under consideration intended by the words, "in lieu of dowry." "It would be intolerable," said the court, in *Dana* v. *Fidler*, 12 *N. Y.* 40, "that a writing, which to the parties and to persons standing in their situation, contained language sufficient to express their meaning, should fail of effect." Without the aid of the surrounding circumstances, the language has a signification which undeniably was not contemplated by the parties, for then it must be held to have reference to a right of dower; but what dower was intended to be thereby discharged or barred, does not appear. When the whole of the *res gestæ* is shown, it is clear that the language used was not employed in its usual sense or signification, but misemployed by the parties, and intended to signify, not dower, but the interest of Benjamin in his father's estate.

Benjamin is estopped by the instrument in question, from making any claim against his father's estate. It appears, affirmatively, that his father, relying on the validity of the instrument as a complete release and discharge of all interest and claim of Benjamin in and to his estate, and believing that thereby Benjamin would be completely and effectually barred from all share whatever of his estate, made no will. Had he supposed that the instrument might prove ineffectual for the purposes which it was designed to answer, he would, undoubtedly, have guarded against the consequences, by making his will and leaving all his property to his other children. His administrators (his son, John W. Havens, one of the complainants, and his son-in-law, Pearson K. Forsyth) did not inventory any claim against Benjamin, for the reason that it was considered that none existed, because of the agreement in question. The moneys paid by Daniel Havens to and for Benjamin, amounted, at the time of the death of the former, to about $2000, which was the amount of his share

of the estate. The complainants, in purchasing the interests of their brothers (other than Benjamin) and their sisters in the farm, and dealing with the farm in that purchase, on the assumption that Benjamin had no interest in it, but that it belonged wholly to the other children, subject to their mother's dower, did so on the faith of the instrument under consideration, and in the confidence that it was indeed the clear discharge and bar which it was not only intended by the parties to it to be, but which they both assuredly supposed that it was.

It appears that but two claims were audited and allowed under the attachment. One was that of the defendant, Thompson, for $509.45, and the other that of William H. Smith, for $53.50. Thompson's claim is for principal and interest of a debt alleged to have been contracted in 1859. It does not appear when Smith's was contracted.

Benjamin's creditors have no better claim to his share of his father's estate than he himself would have. The agreement, if good against him, is equally so against them. *Lockyer* v. *Savage, ubi supra.*

There will be a decree in accordance with these views.